UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

David P. Honan,

Plaintiff,

v.

Civ. No. 01-2238 (JEL/JGL)
ORDER

County of Cottonwood; Cottonwood County Board of Commissioners; Marvin Einertsen, Kenneth Elg, Wendy Meyer, Marlowe Nelsen, and John Oeltjenbruns, in their official and individual capacities; Brian T. Pierce, in his individual capacity; Scott T. Anderson, and Ratwick, Roszak & Maloney, P.A.,

Defendants.

---

Jill Clark, Esq., Jill Clark, P.A., and Wayne J. Rice, Esq., The Law Office of Wayne J. Rice, P.A., appeared for Plaintiff David P. Honan.

Richard A. Beens, Esq., and Eric J. Riensche, Esq., Felhaber, Larson, Fenlon & Vogt, appeared for Defendants County of Cottonwood, Cottonwood County Board of Commissioners, Marvin Einertsen, Kenneth Elg, Wendy Meyer, Marlow Nelsen, and John Oeltjenbruns.

Jon K. Iverson, Esq., Iverson Reuvers, LLC, appeared for Defendant Brian T. Pierce.

Charles E. Lundberg, Esq., Bassford, Lockhart, Truesdell & Briggs, P.A., appeared for Defendants Scott T. Anderson, and Ratwick, Roszak & Maloney, P.A.

---

This is an action by a former Cottonwood County Attorney, David Honan,[1] against Cottonwood County (County), the Cottonwood County Board of Commissioners (Board), several current and former members of the Board (collectively, the Commissioners), a former Assistant Cottonwood County Attorney, and a lawyer and law firm hired by the Board. Honan claims that the defendants violated 42 U.S.C. § 1983 (2000), by conspiring to deprive him of

[1] At the time Honan brought the action he was the Cottonwood County Attorney. As a result of the 2002 elections, Honan no longer holds that position.

FILED MAR 2 1 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED____
DEPUTY CLERK'S INITIALS____

rights guaranteed by the First and Fourteenth Amendments to the United States Constitution, and that they violated 42 U.S.C. § 1985(1) (2000), by conspiring to prevent him from accepting, holding, and discharging the duties of his office. Honan also asserts claims under Minnesota law for breach of contract, defamation, and violations of the Minnesota Open Meeting Law, Minn. Stat. ch. 13D (2002), and the Minnesota Government Data Practices Act, Minn. Stat. ch. 13 (2002). The matter comes before the Court on the defendants' motions for judgment on the pleadings. For the reasons given below, the Court grants the defendants' motions as to Honan's federal civil rights claims, and dismisses his state law claims without prejudice pursuant to 28 U.S.C. § 1367(c)(3) (2000).

## I. SUBJECT MATTER JURISDICTION

The Court has original jurisdiction over Honan's federal civil rights claims pursuant to 28 U.S.C. §§ 1331, 1343 (2000), and supplemental jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367(a).

## II. BACKGROUND[2]

Honan's career in the Cottonwood County Attorney's Office (Office) began in July 1997, when he was hired as an Assistant Cottonwood County Attorney. (SAC ¶ 14.) The Cottonwood County Attorney at that time was L. Douglas Storey. (*Id.*) Honan quickly learned that there was tension between the Office and the Cottonwood County Family Services Agency (Agency). (*Id.* ¶ 15.) The Agency's director, Keith Madson, was a former member of the Board, and, according to Honan, was "still widely viewed as its head." (*Id.*) Honan challenged the conduct of Agency

---

[2] The following background is drawn from Honan's 47-page Second Amended Complaint (SAC), a transcript of the Board's January 31, 2000, meeting, and a resolution passed by the Board at that meeting. The transcript and resolution were attached to Honan's original Complaint as exhibits. Because the Court's decision is limited to Honan's federal civil rights claims, only facts that bear some plausible relationship to those claims will be discussed.

employees several times during his tenure as an Assistant Cottonwood County Attorney. (*Id.* ¶ 16.) In response, Madson "defended his staff and became angry." (*Id.*) Storey, on the other hand, was pleased with Honan's work. In August 1998, he asked the Board to give Honan a raise. (*Id.* ¶ 17.) Less than one month later, on September 25, 1998, Storey terminated Honan without warning or reason, telling him only that Madson and the Board were aware of the decision, and that the Board had approved it. (*Id.* ¶ 19.)

Honan protested his termination by filing a grievance, and the Board commenced the first of three investigations involving Honan. (*Id.* ¶ 20.) The SAC offers little information regarding this investigation, alleging only that it was "unwarranted" (*id.* ¶ 95), that Honan was denied access to the data collected by the Board during the investigation (*id.*), and that an attorney hired by the Board, Scott Anderson, prepared a final investigative report on the matter in late 1998 (*id.* ¶ 72).

The position of Cottonwood County Attorney was on the ballot in 1998. In October 1998, just weeks before the election, Honan decided to run against the incumbent Storey as a write-in candidate. (*Id.* ¶ 21.) During the abbreviated campaign, Honan expressed support for reforming the Agency. (*Id.*) Storey took the opposite approach, condemning Honan for criticizing the Agency, and stating that he was "proud" of the Agency. (*Id.* ¶ 23.) Among the supporters of Storey's candidacy were Madson and all five members of the Board. (*Id.* ¶ 24.) On November 3, 1998, the voters of Cottonwood County turned Storey out of office, and elected Honan as their county attorney. (*Id.* ¶ 25.)

Honan alleges that after the election, the members of the Board "reached an understanding or agreement" to "punish" him, and to deprive him of rights secured by the First and Fourteenth Amendments. (*Id.*) He alleges further that Anderson, who had been retained by

the Board to provide advice regarding the County's 1999 budget, joined in the agreement, and served as "the architect of various schemes designed to ruin Honan [and] force him to resign." (*Id.* ¶ 27.)

According to Honan, the alleged conspirators set their plans in motion even before he took office. The day after the election, Commissioner Marlowe Nelsen asked Honan whether he had talked to Madson yet. (*Id.* ¶ 26.) During the following weeks, Commissioner Nelsen, Commissioner Wendy Meyer, and Anderson told Honan to expect a decrease in the salary of the Cottonwood County Attorney, and Commissioner Nelsen advised Honan not to expect any favorable decisions regarding the 1999 budget until he apologized to Madson. (*Id.* ¶ 28.) On December 22, 1998, the Board reduced the salary of the Cottonwood County Attorney by $7,000, and eliminated a rent subsidy that had previously been provided to the Office. (*Id.* ¶ 29.)

Honan took office in January 1999. (*Id.* ¶ 30.) He worked long hours to ensure that the Office ran smoothly in the face of an increasing workload. (*Id.* ¶ 44.) Despite this, the Board made what Honan alleges was an "openly retaliatory move," reducing Honan's staff from two full-time secretaries to one full-time and one part-time secretary. (*Id.* ¶ 45.) On October 7, 1999, there was a "confrontation" in the Office between the two secretaries, Linda Dieter and Luci Chavez. (*Id.* ¶ 48.) When Honan issued written reprimands to Dieter and Chavez for their roles in the incident, Chavez reacted "with hostility and insubordination." (*Id.*) Honan suspended Chavez for one week for her behavior. (*Id.*) The Board voted to continue paying Chavez out of the Office's budget during her week-long suspension, and would not allow Honan to hire a replacement. (*Id.* ¶ 58.) According to Honan, this made it "extremely difficult" to get the Office's work done. (*Id.*)

After Chavez returned to work, she filed a grievance, which was dismissed. (*Id.* ¶ 49.) She then filed a complaint against Honan under the County's Offensive Conduct, Harassment, and Violence Policy, claiming that Honan had discriminated against her on the basis of her marital status. (*Id.*) Chavez's complaint alleged that Honan changed her position from full-time to part-time status, disciplined her without cause, and threatened to take adverse employment action against her if she did not resign, all because Chavez's husband refused to assist Honan in gathering information on local officials, county employees, and county commissioners. (*Id.*; Compl. Ex. A at 13.) The Board hired an independent investigator, attorney Michelle Soldo, to investigate Chavez's complaint. (SAC ¶ 49.) Honan claims that this second investigation, like the first, was "unwarranted." (*Id.* ¶ 95.)

Honan alleges that Soldo "strategized" with Anderson, and that Soldo and Anderson promised Office staff that they would be protected if they spoke against Honan. (SAC ¶ 56.) When Dieter refused to speak against Honan, Soldo "harassed" her and "threatened her with termination and a criminal investigation." (*Id.* ¶ 57.) On December 6, 1999, Soldo and Honan met for an interview in the Office. (*Id.* ¶ 52.) Honan caught Soldo attempting to access "confidential criminal investigative data" stored on an Office computer. (*Id.*) When Honan confronted her and refused to give her access to the data, Soldo told him that she was entitled to look at anything she wanted to see, and accused Honan of refusing to cooperate with the investigation. (*Id.* ¶¶ 52-53.) Soldo then subjected Honan to four hours of "hostile questioning," during which she spent a great deal of time "interrogating" Honan about a lawsuit that had been filed by one of his campaign supporters against Madson and the County. (*Id.* ¶ 55.) The County has consistently prevented Honan from gaining access to information collected in connection with that lawsuit. (*Id.* ¶ 95.)

Soldo's investigation gave rise to a conflict between Honan and Brian Pierce, an Assistant Cottonwood County Attorney hired by Honan in March 1999. (*Id.* ¶ 60.) Pierce initially supported Honan in the investigation, but at some point he began voicing concerns about his own career, and he predicted that he would replace Honan as Cottonwood County Attorney if Honan were removed. (*Id.* ¶¶ 61-62.) Honan alleges that, at some point between early November and mid-December 1999, Pierce had conversations with other defendants "regarding ways to get rid of Honan, or otherwise harm him." (*Id.* ¶ 64.) In early November 1999, Pierce threatened Honan, telling Honan that he was going to "concoct a story," and inform Soldo that Honan had in fact discriminated against Chavez. (*Id.* ¶ 63.) Pierce did not go through with this plan, and he later apologized to Honan for having threatened him. (*Id.*) Pierce eventually told Soldo, however, that Honan had threatened and intimidated him in an effort to make him provide Soldo with information favorable to Honan. (*Id.*) Pierce's employment with the Office ended on January 4, 2000, when he resigned in "an angry verbal outburst" following "a bitter argument" with Dieter. (*Id.* ¶ 66.) The Board decided to continue to pay Pierce his full salary for six months out of the Office's budget, and refused to allow Honan to hire someone to replace him. (*Id.* ¶ 69.) These actions "greatly interfered" with Honan's ability to perform the work of the Office. (*Id.*)

According to Honan, an agreement "to attack" him was reached by Pierce, members of the Board, and Soldo after Pierce resigned. (*Id.* ¶ 68.) Following the agreement, Pierce filed a complaint against Honan with the Board, claiming that Honan had intimidated him and retaliated against him for cooperating with Soldo's investigation, thereby triggering the Board's third "unwarranted" investigation. (*Id.* ¶¶ 68, 95.) The Board hired an independent investigator, attorney Terese Pautz, to investigate Pierce's complaint. (*Id.*) All that is alleged about this

investigation is that Honan was denied access to the information collected during the investigation, that Pautz completed a final investigative report at some point in 2000, and that Pierce's complaint "was never proven to have any merit." (*Id.* ¶¶ 70, 72, 95.)

Meanwhile, in December 1999, or January 2000, Soldo completed the final investigative report on Chavez's complaint. (*Id.* ¶ 72, 95.) The report contained findings of fact on three main issues: marital discrimination, conflict of interest, and obstruction of the investigative process. (Compl. Ex. A at 14, 30-31.) Honan was not allowed to review Soldo's report or any information collected during the investigation. (SAC ¶ 72, 95.) The Board voted to hold a special meeting on January 31, 2000, to discuss the report. (*Id.* ¶ 73.) Honan sought a temporary restraining order prohibiting the meeting, but his efforts were unsuccessful. (*Id.* ¶ 74; Compl. Ex. A at 2-3.) The Board "went to extraordinary lengths to ensure maximum exposure" for the meeting. (SAC ¶ 75.) It was held in the evening, in a facility capable of accommodating a large audience. (*Id.*) The Board provided "extensive notice" of the meeting to the community, and made arrangements to have the proceedings broadcast live on a local radio station. (*Id.*) More than 150 interested citizens attended. (*Id.*)

At the meeting, Anderson presented recommendations to the Board. It is clear from the transcript of the meeting that Anderson made the recommendations in his capacity as legal counsel for the Board. (*See id.* at 1-2, 5-6, 8, 11, 16.) Anderson stated that the findings did not support Chavez's claim that Honan had violated the County's Offensive Conduct, Harassment, and Violence Policy. (*Id.* at 27-30, 40.) He explained further, however, that by disciplining Chavez twice for the same violation, Honan had violated the County's personnel policy and the "double jeopardy doctrine." (*Id.* at 35-36.) Anderson also remarked that Soldo's findings concerning conflict of interest and obstruction of the investigative process indicated that Honan

may have violated the Minnesota Rules of Professional Conduct, and "cast a cloud over the office of the County Attorney." (*Id.* at 24, 36, 42.) In what Honan describes as a "tremendous sleight-of-hand," Anderson then explained that the Board was "not authorized to take any disciplinary action against the County Attorney" for violations of those rules, and recommended that the Board forward the information to the Minnesota Lawyers Professional Responsibility Board. (*Id.* at 36, 42.)

At the conclusion of Anderson's presentation, the Board gave Honan an opportunity to comment. (*Id.* at 49.) It appears from the transcript, however, that Honan was not present at the meeting. (*See id.* at 49-50.) Following a question-and-answer session during which the Board, Anderson, and Soldo fielded several written inquiries from members of the audience (*id.* at 52-78), Anderson presented the Board with a proposed Resolution Regarding County Attorney's Office Investigation (Resolution) (*id.* at 79-85). The Board passed the Resolution unanimously. (*Id.* at 87-88.)

The language of the Resolution essentially tracked Anderson's recommended conclusions. (Compl. Ex. B.) It also provided:

> 9. The Board reiterates its desire and intention that supervisors, including elected officials, conduct themselves with a demeanor, decorum and respect for others that allows for the smooth operation of government offices, and establish workplaces for the County's employees in which all persons are accorded respect and are free from offensive or intimidating circumstances.
>
> 10. The County Board requests that the County Attorney refrain from making any statements to any County employee, including employees of his office, which could be construed as insensitive, hostile or intimidating. Specifically, it is requested that he refrain from statements such as the one made to [Chavez] that she would "go down in a ball of flames" unless she resigned. Further, the County Attorney is reminded that employees of his office are subject to the County Personnel Policies and have the rights afforded to them under those policies unless or until those policies are amended or repealed by the County Board.

> 11. Due to the pendency of [Pierce's] complaint against the County Attorney, and the findings regarding obstruction of investigatory process, the County Attorney is reminded of and requested to comply with the following:
>
> a) Lawyers holding public office assume legal responsibilities going beyond those of other citizens, and other lawyers. A lawyer has a duty to maintain the integrity of the legal profession, and by example, should not demonstrate hostility towards or indifference to the policy of equal justice under the law;
>
> b) A department head of Cottonwood County, or any county, whether elected or appointed, holds a position of authority over those within his or her department, and . . . thus must act as an example towards others;
>
> c) As an employer, Cottonwood County has a responsibility to conduct investigations of facts surrounding alleged violations of the anti-discrimination policies of Cottonwood County. Employees are required by personnel policy to cooperate with such investigations. Department heads, whether elected or appointed, should not advise employees in a manner which conflicts with the policies;
>
> d) As employees are required to cooperate with such investigation[s], elected officials should also cooperate. Beyond that, no elected official or department head should take action during an investigation which leads to the appearance of impropriety or which may give the appearance that an individual is attempting to influence testimony, hide relevant information, or be engaging in acts of retaliation or reprisal.

(*Id.* ¶¶ 9-11.)

The Board and Anderson later filed separate complaints against Honan with the Minnesota Office of Lawyers Professional Responsibility, the body responsible for investigating complaints against attorneys. (*Id.* at 83.) Both complaints were ultimately dismissed. (*Id.*)

## III. STANDARD OF DECISION

There are three dispositive motions before the Court: (1) Pierce's Motion to Dismiss or for Summary Judgment; (2) the County Defendants' Motion to Dismiss or for Summary

Judgment; and (3) Anderson's Motion to Dismiss.[3] Because the motions were filed after the close of pleadings, the Court views the motions to dismiss as motions for judgment on the pleadings under Fed. R. Civ. P. 12(c). *See Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990); *St. Paul Ramsey County Med. Ctr. v. Pennington County, S.D.*, 857 F.2d 1185, 1187 (8th Cir. 1988).

In connection with their motion, the County Defendants submitted the supporting affidavits of Soldo and Sandra Gardebring. Honan has moved to strike the affidavits. If the affidavits are not excluded, the defendants' motions will be converted into motions for summary judgment. *See* Fed. R. Civ. P. 12(c). It would be inappropriate to apply the summary judgment standard at this stage of the litigation because the parties have not yet had the opportunity to develop the record through discovery. *See id.* 56(f). Accordingly, the Court grants Honan's motion to strike the affidavits of Soldo and Gardebring, and it will treat all of the defendants' motions as motions for judgment on the pleadings under Rule 12(c).

When presented with a defendant's motion for judgment on the pleadings, a court must accept as true all facts pleaded by the plaintiff, and grant all reasonable inferences that arise from the pleadings in the plaintiff's favor. *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 803 (8th Cir. 2002); *Lion Oil Co., Inc. v. Tosco Corp.*, 90 F.3d 268, 270 (8th Cir. 1996). The motion should be granted if no material issue of fact remains to be resolved and the defendant is entitled to judgment as a matter of law. *Faibisch*, 304 F.3d at 803; *Lion Oil*, 90 F.3d at 270.

---

[3] As used in this discussion, the term "County Defendants" refers to the County, the Board, and the Commissioners, and the term "Anderson" refers to both Anderson and the law firm for which he works, Ratwick, Roszak & Maloney, P.A.

## IV. SECTION 1983 CLAIM

Honan claims the defendants conspired to deprive him of rights secured by the First and Fourteenth Amendments, in violation of 42 U.S.C. § 1983. The Second Amended Complaint (SAC) sets forth this claim in rather unwieldy fashion:

> Defendants under color of law (state action), and each of them individually (the public officials, in addition to engaging in conduct that provides evidence of *Monell* liability, either engaged in acts that did not require or allow for discretion or in the exercise of their discretion knowingly or maliciously violated a known right or unjustifiably violated a known right or engaged in conduct that was not legally reasonable, acted outside their official duties, engaged in operational level or personal activity, or are not otherwise entitled to immunity), or jointly in conspiracy with one or more other defendant(s) and as such that two or more defendants agreed to (both in and outside official meetings, and apparently in different configurations of defendants depending on the particular gathering or goal, and as more fully set forth above) engage in acts designed to further the conspiracies and did so engage in those acts, they knew of the conspiracy and intended to take part in the conspiracy and they took action(s) designed directly or indirectly to implement the conspiracy or other overt acts, and with unconstitutional motive, directly or indirectly deprived Plaintiff of his rights, privileges, and immunities secured by the laws of the United States (including but not limited to 42 U.S.C. § 1985) or the United States constitution, and/or equal protection under the law, under the First and Fourteenth Amendments to the United States Constitution, including but not limited to the following clearly established rights (what a reasonable official/individual/entity would have understood as the law or actual or constructive knowledge of the right(s)):
>
> a. to pursue the career for which he was trained, to keep his job, the intangible benefits of serving in the position of County Attorney, to obtain future employment, to not be stigmatized by allegations of the defendants and by their refusal to allow him the opportunity to clear his good name;
>
> b. to due process (substantive and/or procedural);
>
> c. to be free from the use of summary punishment;
>
> d. to equal protection under the laws (including but not limited to selective enforcement, including but not limited to the protected category of asserters of the First Amendment right to freedom of expression);

e. to freedom of expression; the right to petition; freedom of association; access to the courts/counsel; right to file lawsuit; and freedom from retaliation for exercise of First Amendment rights; and

f. to discharge the duties of the County Attorney's Office.

(SAC ¶ 99.) The SAC fails to identify the specific factual bases for any of the alleged violations. Quite understandably, the defendants have struggled to determine the precise nature of Honan's claim. In his papers in opposition to the defendants' motions and at oral argument, Honan brought his claim into slightly sharper focus. It now appears that Honan is claiming that the defendants conspired to deprive him of his rights to petition, free expression, and free association under the First Amendment, and his rights to equal protection of the laws and due process of law under the Fourteenth Amendment.

**A. Deprivation of Constitutional Right**

In order to maintain his section 1983 claim, Honan must demonstrate that the defendants' conduct violated a right secured by the First or Fourteenth Amendments. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150 (1970); *DuBose v. Kelly*, 187 F.3d 999, 1002 (8th Cir. 1999); *Jones v. Gutschenritter*, 909 F.2d 1208, 1211 (8th Cir. 1990). In the absence of an underlying constitutional violation, a section 1983 conspiracy claim cannot be sustained. *Cook v. Tadros*, 312 F.3d 386, 388-89 (8th Cir. 2002); *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999).

*1. First Amendment*

Relying primarily on *White v. Lee*, 227 F.3d 1214 (9th Cir. 2000), Honan contends that the defendants' conduct had a chilling impact on his right to express his politically controversial viewpoints about Madson, the Agency, and "other issues," his right to associate with his supporters, and his right to petition the Board and state courts regarding the Agency's practices. In *White*, the San Francisco office of the United States Department of Housing and Urban

Development (HUD) conducted an eight-month investigation into the activities and beliefs of three neighbors who opposed a developer's plan to convert a local motel into a multi-family housing project. *Id.* at 1220. During the course of the investigation, HUD questioned the neighbors under threat of subpoena about their views and public statements regarding the project, directed them to produce an array of documents and information relating to their efforts in opposition to the project, and informed the neighbors and a major metropolitan newspaper that the neighbors' activities violated the Fair Housing Act. *Id.* HUD also advised the neighbors to accept a conciliation proposal that required them to cease all litigation and the distribution of newsletters and flyers opposing the project. *Id.* The neighbors brought a *Bivens* action against several HUD officials, claiming that HUD investigated and harassed them solely because of the exercise of their First Amendment rights to free speech and to petition the government for a redress of grievances. *Id.* at 1225. The Ninth Circuit agreed, concluding that HUD's "eight-month investigation into the [neighbors'] activities and beliefs chilled the exercise of their First Amendment rights." *Id.* at 1226.

The fundamental difference between *White* and the present case is that the Board did not conduct an investigation into Honan's speech, his association with supporters, or his filing of any petition. Rather, the Board's investigations were directed at the circumstances surrounding Honan's termination in September 1998, Chavez's complaint that Honan had discriminated against her on the basis of marital status, and Pierce's complaint that Honan had intimidated him and retaliated against him for cooperating with the Board's investigation into Chavez's complaint. Furthermore, in *White*, HUD took action to prevent the neighbors from exercising their First Amendment rights, telling them (and the media) that their activities were illegal, and urging them to discontinue their opposition to the project. *Id.* at 1220. In this case, there are no

factual allegations that the Board or any other defendant suggested that it was illegal for Honan to express his political views, associate with his supporters, or petition the government for redress of grievances, or that the defendants otherwise employed "the threat of legal sanctions and other means of coercion, persuasion, and intimidation" to prevent him from doing so. *See White*, 227 F.3d at 1228 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)).

Honan also contends that the defendants retaliated against him for exercising his First Amendment rights during the 1998 campaign, presumably by conducting the investigations and reducing his staff and salary. Public employers generally cannot discharge or suspend employees solely on the basis of their comments on matters of public concern. *See Connick v. Myers*, 461 U.S. 138, 146 (1983); *Finkelstein v. Bergna*, 924 F.2d 1449, 1453 (9th Cir. 1991). However, the Court is not aware of any authority supporting the proposition that an elected official who engages in activity protected by the First Amendment during a campaign is thereafter insulated from downward reductions in salary or staff, or that such an official is thereafter shielded from investigation in the event that an employee makes a complaint against him. Based on these considerations, the Court concludes that the factual allegations in the SAC fail to establish that Honan was deprived of his First Amendment rights.

2. *Fourteenth Amendment—Equal protection*

Honan asserts the SAC adequately pleads an equal protection violation because it shows that the defendants treated him worse than they treated Madson, even though Honan was merely accused of violating the County's Offensive Conduct, Harassment, and Violence Policy, and Madson "arguabl[y] committed a criminal act." Honan and Madson, however, are not similarly situated. The Board never received a complaint that Madson violated the County's policy. The factual allegations in the SAC do not identify any instance in which the Board failed to

investigate a complaint brought under the policy against a County employee. The Court therefore concludes that the allegations do not establish that Honan was deprived of equal protection.

3. *Fourteenth Amendment—Due process*

The requirements of due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of life, liberty, and property. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972). Honan suggests the defendants' conduct injured his reputation and standing in the community. Injury to reputation, however, is not a liberty interest protected under the Fourteenth Amendment, *Siegert v. Gilley*, 500 U.S. 226, 233 (1991); *Paul v. Davis*, 424 U.S. 693, 708-09 (1976), even if the individual's damaged reputation impairs future employment prospects, *Siegert*, 500 U.S. at 234. Honan also suggests that he was deprived of his liberty interest in "pursu[ing] the career for which he was trained—attorney."[4] The Supreme Court has indicated that the liberty guaranteed by the Fourteenth Amendment's Due Process Clause includes the right of the individual "to engage in any of the common occupations of life." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). Honan has offered no explanation as to how the defendants' conduct deprived him of this interest.

In sum, the factual allegations in the SAC and the reasonable inferences arising from those allegations fail to establish that the defendants' conduct deprived Honan of a constitutional right, either under the First Amendment or the Fourteenth Amendment. The Court therefore concludes that the defendants are entitled to judgment on the pleadings with respect to Honan's section 1983 conspiracy claim.

---

[4] Honan denies that his due process claim is based on the loss of his job. (Plaint.s' Mem. Opp. Pierce's Mot. Dismiss at 19 n.2.)

## B. Absolute Legislative Immunity

The Court also concludes the Commissioners are entitled to absolute legislative immunity from section 1983 liability to the extent that Honan's claim is based on their legislative activities. *See Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) ("Local legislators are entitled to absolute immunity from § 1983 liability for their legislative activities."); *Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607, 612-14 (8th Cir. 1980). "Absolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'" *Bogan*, 523 U.S. at 54 (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)). "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Id.*; *see Tenney*, 341 U.S. at 377 (stating absolute legislative immunity not destroyed by "an unworthy purpose").

An investigation by a legislative body falls within the sphere of legitimate legislative activity so long as the investigation "may fairly be deemed within its province." *See Tenney*, 341 U.S. at 377-79; *Green v. DeCamp*, 612 F.2d 368, 371-72 (8th Cir. 1980). For example, in *Tenney*, the plaintiff circulated a petition urging members of the California Legislature not to appropriate funds for the California Senate Fact-Finding Committee on Un-American Activities. 341 U.S. at 370. When the committee learned of the petition, it asked local officials to initiate criminal proceedings against the plaintiff, and summoned him to appear before the committee. *Id.* When the plaintiff refused to testify at the committee hearing, the chairperson read the plaintiff's alleged criminal record into the record. *Id.* at 371. The plaintiff was subsequently prosecuted for contempt in state court based on his refusal to testify at the hearing. *Id.*

The plaintiff later brought an action against the committee and certain of its members, alleging that the committee's investigation was designed "to intimidate and silence him," to

prevent him from exercising his First Amendment rights, and to "deprive him of the equal protection of the laws, due process of law, and of the enjoyment of equal privileges and immunities as a citizen of the United States." *Id.* The Supreme Court held that the defendants were entitled to absolute legislative immunity because the plaintiff's claim was based on the committee's investigation of "a problem within legislative concern," *id.* at 378, and its actions "in a field where legislators traditionally have power to act," *id.* at 379. Speaking for the Court, Justice Frankfurter explained:

> Investigations, whether by standing or special committees, are an established part of representative government. . . . In times of political passions, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses. The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province.

*Id.* at 378-79.

In *Green*, a Select Committee of the Nebraska Legislature reviewed a local police chief's investigation into the death of a Nebraska resident. 612 F.2d at 369. The committee conducted hearings and released a committee report stating that the police chief's investigation was "totally inadequate, [and] lacking in professionalism," and that his conduct suggested that "there may have been an intentional effort by [him], . . . to justify a suicide theory during the coroner's inquest at the expense of the facts." *Id.* The police chief sued the members of the committee under section 1983, claiming that they had deprived him of liberty and property without due process of law. *Id.* The Eighth Circuit, relying heavily on *Tenney*, concluded that the committee's investigation and the release of the report critical of the police chief were within its legislative authority, and that the defendants were therefore entitled to absolute legislative immunity. *Green*, 621 F.2d at 371-72.

Applying *Tenney* and *Green* to the facts of this case, it is clear that the Commissioners are entitled to absolute legislative immunity insofar as Honan's claim is based on the Board's investigations, including their holding of the January 31, 2000, meeting, and their passage of the Resolution memorializing their conclusions. The question investigated by the Board in each of the investigations was whether an official in the executive branch had violated the County's employment policies. This inquiry "may fairly be deemed within [the Board's] province." *See Tenney*, 341 U.S. at 378.

Absolute legislative immunity also applies to the Commissioners' votes to reduce the salary of the Cottonwood County Attorney and to reduce Honan's staff from two full-time secretaries to one full-time secretary and one part-time secretary. The Commissioners' acts of voting on the resolutions were "quintessentially legislative" in form. *See Bogan*, U.S. at 55. Moreover, the resolutions were legislative in substance because they "reflected a discretionary, policymaking decision implicating the budgetary priorities of the [County]." *See id.* at 55-56.

**C. Qualified Immunity**

Government officials are entitled to qualified immunity from liability for damages under section 1983 if "'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Domina v. Van Pelt*, 235 F.3d 1091, 1096 (8th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When faced with an assertion of qualified immunity in an action involving an alleged constitutional violation, the Court must first determine whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Lockridge v. Bd. of Trustees of Univ. of Ark.*, 315 F.3d 1005, 1008 (8th Cir. 2003). As previously discussed, the factual allegations in the SAC and the

reasonable inferences arising from those allegations fail to establish that the defendants' conduct deprived Honan of a constitutional right. Thus, to the extent that Honan's section 1983 claim is based on actions that do not fall within the sphere of legitimate legislative activity, the Commissioners are entitled to qualified immunity. In addition, because Pierce was a government official from March 1999, when Honan hired him as an Assistant County Attorney, through January 4, 2000, when he resigned, Pierce is entitled to qualified immunity insofar as Honan's claim is based on conduct that occurred during that time period.

## V. SECTION 1985(1) CLAIM

Honan's second claim is that the defendants violated section 1985(1) by conspiring to prevent him from accepting, holding, and discharging the duties of his office. The relevant portion of section 1985(1) proscribes conspiracies to "prevent, by force, intimidation, or threat, any person from accepting or holding any *office, trust, or place of confidence under the United States*, or from discharging the duties *thereof*." (Emphasis added.) As the italicized language indicates, only federal officers are protected by section 1985(1). *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 283 n.15 (1993) (noting section 1985(1) deals with "officers *of the United States*"); *Kush v. Rutledge*, 460 U.S. 719, 724 (1983) (explaining that section 1985(1) relates to "federal officers"); *Gill v. Farm Bureau Life Ins. Co. of Mo.*, 906 F.2d 1265, 1269 (8th Cir. 1990) (quoting *Kush*); *Coleman v. Garber*, 800 F.2d 188, 190 (8th Cir. 1986) (quoting *Kush*); *Harrison v. Springdale Water & Sewer Comm'n*, 780 F.2d 1422, 1429 (8th Cir. 1986) (stating section 1985(1) proscribes "conspiracies to interfere with the performance of official duties by federal officers"); *Wisdom v. HUD*, 713 F.2d 422, 425 (8th Cir. 1983) ("Section 1985(1) prohibits conspiracy to prevent a federal officer from performing his [or her] duty.").

Honan argues that he is a federal officer because he took an oath to uphold the United States Constitution when he became the Cottonwood County Attorney. Honan's theory does not comport with the language or structure of section 1985. Section 1985 draws a "basic distinction" between officers of the United States, who are covered by section 1985(1), and state officers, who are covered by section 1985(3). *See Bray*, 506 U.S. at 283 n.15 (noting "basic distinction"). Every state legislative, executive, and judicial officer is required to take an oath or affirmation to support the United States Constitution. U.S. Const., art. VI, cl. 3; 4 U.S.C. § 101 (2000). Thus, if taking an oath to uphold the Constitution makes one a federal officer, then all state officers are federal officers, and section 1985's "basic distinction" between the two groups loses much of its meaning. Furthermore, taken to its logical end, Honan's argument would extend section 1985(1) to naturalized citizens, former citizens who regain citizenship, and attorneys, all of whom are required by federal or state law to take an oath or affirmation to support the United States Constitution. *See* 8 U.S.C. §§ 1427(f)(2), 1448(a) (2000) (naturalized citizens); *Id.* §§ 1435, 1448(a) (former citizens who regain citizenship); Minn. Stat. § 358.07(9) (2002) (attorneys).

Honan's argument is also inconsistent with cases interpreting section 1985(1). With the exception of *Lewis v. News-Press & Gazette Co.*, 782 F. Supp. 1338 (W.D. Mo. 1992), federal courts have uniformly rejected attempts to extend section 1985(1) to state or local government officials. *See Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998) (holding section 1985(1) does not cover state law enforcement officers); *Canlis v. San Joaquin Sheriff's Posse Comitatus*, 641 F.2d 711, 718 (9th Cir. 1981) (same); *Santiago v. City of Vineland*, 107 F. Supp. 2d 512, 560 (D.N.J. 2000) (municipal police officers); *Salmon v. Miller*, 951 F. Supp. 103, 106 (E.D. Tex. 1996) (municipal judge); *Town of Brookline v. Operation Rescue*, 762 F. Supp. 1521, 1523 (D. Mass. 1991) (state officials); *Miller v. Ind. Hosp.*, 562 F. Supp. 1259, 1281

(W.D. Pa. 1983) ("non-federal officials"); *Sellner v. Panagoulis*, 565 F. Supp. 238, 245 (D. Md. 1982) (retired county police sergeant); *Baron v. Carson*, 410 F. Supp. 299, 300-01 (N.D. Ill. 1976) (county official).

Honan contends that *Brewer v. Hoxie School District Number 46*, 238 F.2d 91 (8th Cir. 1956), and *Lewis* support his position that he is a federal officer. *Brewer* involved an action by an Arkansas school district, school board members, and a school superintendent against a number of organizations and individuals who had conspired to prevent them from desegregating the district's schools following the Supreme Court's decisions in *Brown v. Board of Education*, 347 U.S. 483 (1954), and 349 U.S. 294 (1955). *Brewer*, 238 F.2d at 93. *Brewer* made reference to the fact that the plaintiffs had taken an oath to support the United States Constitution to buttress its conclusion that the plaintiffs had a duty, and a corresponding right, to comply with the Fourteenth Amendment by desegregating the public schools within their jurisdiction. *Id.* at 98-99.[5]

*Brewer* did not view the oath as performing the additional function of transforming the plaintiffs into federal officers for purposes of section 1985(1). First, although *Brewer* cited section 1985(2), which addresses, *inter alia*, conspiracies to deny or prevent the enforcement of the right to equal protection of the laws, and discussed the second clause of section 1985(3), which deals with conspiracies to prevent or hinder "the constituted authorities of any State . . .

---

[5] For example, *Brewer* explained:

> The plaintiffs being bound by constitutionally imposed duty and their oaths of office to support the Fourteenth Amendment and to accord equal protection of the laws to all persons in their operation of the Hoxie schools must be deemed to have a right, which is a federal right, to be free from direct interference in the performance of that duty.

*Id.* at 98-99.

from giving or securing to all persons within such State . . . the equal protection of the laws," it did not mention section 1985(1). *See Brewer*, 238 F.2d at 94, 103-04. Second, *Brewer*'s application of the second clause of section 1985(3), which applies to *state* officers, *Bray*, 506 U.S. at 283 n.15; *Griffin v. Breckenridge*, 403 U.S. 88, 99 (1971), establishes that the court did not consider the plaintiffs to be federal officers, even though they had taken the oath. Finally, *Brewer* referred to the plaintiffs as state officers or officials four times, and never referred to them as federal officers. 238 F.2d at 93, 95, 102. In sum, *Brewer* provides no support for Honan's argument.

The same can be said of *Lewis*. In that case, a Missouri state judge brought a section 1985(1) claim against a newspaper and others. *Lewis*, 782 F. Supp. at 1341. The defendants moved to dismiss the claim on the ground that the plaintiff was not a federal officer. *Id.* The District Court for the Western District of Missouri denied their motion, concluding that the plaintiff was a "non-federal official" who nonetheless held an "office, trust, or place of confidence under the United States." *Id.* at 1342. The court provided four reasons for its conclusion: (1) state judges decide federal constitutional issues on a regular basis; (2) they are bound by the United States Constitution and take an oath or affirmation to support it; (3) in deciding federal constitutional issues, they are bound by decisions of the United States Supreme Court; and (4) the plaintiff's claim arose from his decision on a federal constitution question—specifically, whether the defendant newspaper had a right to the names of grand jurors under the First Amendment. *Id.*

The court in *Lewis* took great care to limit its holding to state judges whose claims arise from their decision on a federal constitutional issue. *Lewis* observed, for example, that the plaintiff held "a unique position of mixed state and federal authority and responsibility," *id.* at

1341, that state judges play a "uniquely quasi-federal role," *id.* at 1342, and that the case presented a "unique fact situation" because:

> [the plaintiff], unlike any other state official that this court can think of, [held] a uniquely quasi-federal position for purposes of this case, not just because of his federal constitutional authority and responsibility, but rather because this entire case has evolved out of plaintiff's discharging his duties by ruling on a federal constitutional question.

*Id.* at 1342-43. Underscoring this point, *Lewis* closed its discussion with a warning that the ruling was "confined strictly to the facts of this case and should not be interpreted to open the floodgates to § 1985(1) claims by non-federal officials." *Id.* at 1343. Because Honan is not a state judge, he is not covered by *Lewis*'s narrow holding.[6]

Based on these considerations, the Court concludes that Honan cannot maintain a claim under section 1985(1) because he does not hold an "office, trust, or place of confidence under the United States." The Court therefore grants the defendants' motions on this claim.

## VI. STATE LAW CLAIMS

Honan's remaining claims are based on Minnesota law. The sole basis for the Court's jurisdiction over these claims is 28 U.S.C. § 1367(a), which permits a district court to exercise supplemental jurisdiction over claims that are part of the same case or controversy as claims that fall within its original jurisdiction. A district court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). Having dismissed all claims falling within its original jurisdiction, the Court declines to exercise supplemental jurisdiction over Honan's state law claims. *See Gregoire v. Class*, 236 F.3d 413, 419-20 (8th Cir. 2000); *Franklin v. Zain*, 152 F.3d 783, 786 (8th Cir. 1998); *Save Our*

---

6 The Court expresses no opinion as to whether it would follow *Lewis* if presented with a section 1985(1) claim by a state judge arising from the judge's ruling on a federal constitutional issue.

*Health Org. v. Recomp of Minn., Inc.*, 829 F. Supp. 288, 293 (D. Minn. 1993), *aff'd*, 37 F.3d 1334 (8th Cir. 1994).

## VII. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Honan's motion to strike affidavits [Docket No. 40] is GRANTED.

2. Pierce's motion for judgment on the pleadings [Docket No. 21] is GRANTED in part.

3. County Defendants' motion for judgment on the pleadings [Docket No. 31] is GRANTED in part.

4. Anderson's motion for judgment on the pleadings [Docket No. 27] is GRANTED in part.

5. Honan's federal civil rights claims (Count I) are DISMISSED with prejudice.

6. Honan's state law claims (Counts II-V) are DISMISSED without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

Dated: March 20, 2003

JOAN ERICKSEN LANCASTER
United States District Judge